# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

CALIFORNIA AIR RESOURCES BOARD,
    Plaintiff

    v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, *et al*.,
    Defendants

Civil Action No. 19-965(CKK)

## MEMORANDUM OPINION
(June 3, 2020)

This is a Freedom of Information Act ("FOIA") action, in which Plaintiff California Air Resources Board seeks records from the United States Environmental Protection Agency ("EPA") and the National Highway Traffic Safety Administration ("NHTSA") regarding the notice of proposed rulemaking for the Safer Affordable Fuel-Efficient ("SAFE") Vehicles rulemaking. In response to Plaintiff's twelve-part request, Defendants identified and produced certain responsive records. Before the Court are Plaintiff's [10] Motion for Summary Judgment and Defendants' [18] Motion for Summary Judgment. Two main issues are presented in the parties' summary judgment briefing. First, Plaintiff contends that Defendant NHTSA's search in response to part 1 of her request was inadequate. Second, Plaintiff contends that Defendant EPA wrongfully redacted two email threads and Defendant NHSTA wrongfully withheld two draft reports, both pursuant to FOIA Exemption 5's deliberative process privilege.[1]

---

[1] Initially, Plaintiff also contested Defendant NHTSA's search in response to part 4 of its request. But, Plaintiff later withdrew those objections. Pl.'s Reply, ECF No. 20, 2 n.1. Additionally, Plaintiff challenges Defendant EPA's withholding under Exemption 5 of records responsive to part 12 of its request. However, the parties are awaiting a decision on this issue currently pending in the United States Court of Appeals for the Second Circuit in a separate FOIA suit. Defs.' Mot., ECF No. 18, 5; ECF No. 15.

Upon consideration of the pleadings,[2] the relevant legal authorities, and the record for purposes of this motion, the Court GRANTS Defendants' Motion for Summary Judgment and DENIES Plaintiff's Motion for Summary Judgment. First, the Court finds that Defendant NHTSA's search in response to part 1 of Plaintiff's request was adequate. Second, the Court finds that the information Defendant EPA withheld in two email threads and Defendant NHSTA withheld in two draft reports is protected from disclosure by FOIA Exemption 5's deliberative process privilege.

## I.    BACKGROUND

On August 24, 2018, EPA and NHTSA issued a joint Notice of Proposed Rulemaking ("NPRM") proposing to set out federal greenhouse gas emission and fuel economy standards for cars and light trucks. Pl.'s Statement of Material Facts ("Pl.'s Stat."), ECF No. 10, ¶ 1. On September 11, 2018, CARB sent the same letter to EPA and NHTSA containing a 12-part request for information about the data, analyses, and other materials the agencies used in their NPRM. Pl.'s Stat., ECF No. 10, ¶ 4-5; Defs.' Statement of Material Facts ("Defs.' Stat."), ECF No. 18-4, ¶ 1-2.

---

[2] The Court's consideration has focused on the following documents:

• Pl.'s Mot. for Summary Judgment ("Pl.'s Mot."), ECF No. 10;
• Defs.' Opp'n to Pl.'s Mot. for Summary Judgment and Mem. of Points and Authorities in Support of its Cross-Mot. for Summary Judgment ("Defs.' Mot."), ECF No. 18;
• Pl.'s Opp'n to Defs.' Cross-Mot. for Summary Judgment and Reply in Support of Pl.'s Mot. for Summary Judgment ("Pl.'s Reply"), ECF No. 20;
• Defs.' Reply in Support of their Cross-Mot. for Summary Judgment ("Defs.' Reply"), ECF No. 22;
• Pl.'s Notice of Development: Release of Final Rule ("Pl.'s Not."), ECF No. 25; and
• Defs.' Res. to Pl.'s Notice of Development ("Defs.' Res."), ECF No. 28.

In an exercise of its discretion, the Court finds that holding oral argument in this action would not be of assistance in rendering a decision.  *See* LCvR 7(f).

As is relevant for purposes of this Memorandum Opinion, part 1 of Plaintiff's request asked for "[i]nformation about the models and data used to estimate battery costs for electrified vehicles." Ex. A, ECF No. 1, 2. Subpart A explained that the proposal and Preliminary Regulatory Impact Analysis ("PRIA") did "not state which version of the BatPaC NHTSA and U.S. EPA used to estimate battery costs." *Id.* at 2-3. Subpart B stated that "U.S. EPA and NHTSA should make available the information specifying the full battery sizes, in kilowatt-hours (kWh), battery pack configuration, and costs used for each vehicle iteration in the CAFE model." *Id.* at 3. Finally, subpart C stated that "[t]he proposal and PRIA provide conflicting information about which battery chemistries the agencies considered." *Id.* Part 8 of Plaintiff's request asked for "the agencies detailed explanation and derivation of their point estimates for the increase in fatalities per hundred pounds of mass reduction over a constant footprint based on historical crash data." *Id.* at 5. Plaintiff explained that the details of such analysis had not been provided in a report. *Id.*

In response to the part 1 subpart A of the request, Defendant NHTSA stated that BatPaC version 3.0 was used for the NPRM and, because it did not have BatPaC version 3.0 in its possession, directed CARB to the United States Department of Energy's Argonne National Laboratories ("ANL") to obtain a copy of the model. Pl.'s Stat., ECF No. 10, ¶ 14-15. Defendant EPA did not have any responsive materials. Pl.'s Stat., ECF No. 10, ¶ 22. In response to part 1 subpart B of the request, both Defendant NHTSA and EPA indicated that they did not have any records indicating the battery pack configuration used int the BatPaC model for the NPRM. Pl.'s Stat., ECF No. 10, ¶ 26, 32.  In response to part 1 subpart C of the request, Defendant NHTSA indicated that the battery chemistries associated with the BatPaC version 3.0 model were used. But, neither Defendants produced responsive records. Pl.'s Stat., ECF No. 10, ¶ 40-42. Finally,

in response to part 8 of the request, Defendant NHTSA withheld two draft reports and Defendant

EPA indicated that it had no responsive records. Pl.'s Stat., ECF No. 10, ¶ 54, 55, 64; Defs.'

Stat., ECF No. 18-4, ¶ 4.

On December 19, 2018, CARB appealed Defendant NHTSA's response to parts 1 and 8

of the request and objected to Defendant EPA's lack of response. Pl.'s Stat., ECF No. 10, ¶ 66,

70. The agencies did not respond to the appeal. On April 5, 2019, CARB filed the Complaint in

this case. ECF No. 1. Following Defendants' answer, the Court ordered the parties to meet and

confer. ECF No. 7. As a result of the meet and confer, and is as relevant to this Memorandum

Opinion, Defendant EPA disclosed two redacted email records responsive to part 1 of Plaintiff's

request. Defs.' Stat., ECF No. 18-4, ¶ 8.

Unable to resolve their remaining issues, the parties have filed Cross Motions for

Summary Judgment. ECF Nos. 10, 18. There are two primary issues in dispute. First, Plaintiff

argues that Defendant NHTSA conducted an inadequate search in response to part 1 of its

request. Second, Plaintiff contends that, under FOIA Exemption 5's deliberative process

privilege, Defendant EPA wrongfully redacted two email chains responsive to part 1 of the

request and Defendant NHTSA wrongfully withheld two draft reports responsive to part 8 of the

request.

## II.     LEGAL STANDARD

Congress enacted FOIA to "pierce the veil of administrative secrecy and to open agency

action to the light of public scrutiny." *Dep't of the Air Force v. Rose*, 425 U.S. 352, 361 (1976)

(internal quotation marks omitted). Congress remained sensitive to the need to achieve balance

between these objectives and the potential that "legitimate governmental and private interests

could be harmed by release of certain types of information." *Fed. Bureau of Investigation v.*

*Abramson*, 456 U.S. 615, 621 (1982). To that end, FOIA "requires federal agencies to make Government records available to the public, subject to nine exemptions." *Milner v. Dep't of Navy*, 562 U.S. 562, 562 (2011). Ultimately, "disclosure, not secrecy, is the dominant objective of the Act." *Rose*, 425 U.S. at 361. For this reason, the "exemptions are explicitly made exclusive, and must be narrowly construed." *Milner*, 562 U.S. at 565 (internal quotation marks and citations omitted).

When presented with a motion for summary judgment in this context, the district court must conduct a "de novo" review of the record, which requires the court to "ascertain whether the agency has sustained its burden of demonstrating the documents requested are ... exempt from disclosure under the FOIA." *Multi Ag Media LLC v. Dep't of Agriculture*, 515 F.3d 1224, 1227 (D.C. Cir. 2008) (internal quotation marks omitted). The burden is on the agency to justify its response to the plaintiff's request. 5 U.S.C. § 552(a)(4)(B). "An agency may sustain its burden by means of affidavits, but only if they contain reasonable specificity of detail rather than merely conclusory statements, and if they are not called into question by contradictory evidence in the record or by evidence of agency bad faith." *Multi Ag Media*, 515 F.3d at 1227 (internal quotation marks omitted). "If an agency's affidavit describes the justifications for withholding the information with specific detail, demonstrates that the information withheld logically falls within the claimed exemption, and is not contradicted by contrary evidence in the record or by evidence of the agency's bad faith, then summary judgment is warranted on the basis of the affidavit alone." *Am. Civil Liberties Union v. U.S. Dep't of Defense*, 628 F.3d 612, 619 (D.C. Cir. 2011). "Uncontradicted, plausible affidavits showing reasonable specificity and a logical relation to the exemption are likely to prevail." *Ancient Coin Collectors Guild v. U.S. Dep't of State*, 641 F.3d 504, 509 (D.C. Cir. 2011). Summary judgment is proper when the pleadings, the discovery

materials on file, and any affidavits or declarations "show[ ] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## III. DISCUSSION

Having reviewed the parties' arguments as well as the supporting declarations, the Court concludes that Defendants are entitled to summary judgment. Defendant NHTSA conducted a reasonable search in response to part 1 of Plaintiff's request. And, Defendants NHTSA and EPA's withholdings pursuant to FOIA Exemption 5's deliberative process privilege were justified.

### A. Propriety of FOIA Request

As an initial matter, Defendants contend that Plaintiff's letter was not a proper FOIA request. Defendants argue that portions of Plaintiff's letter are requests for explanations rather than proper FOIA requests for documents. The Court disagrees. While Plaintiff's requests would have benefitted from more precise language, the requests did not cross the line from document requests to non-FOIA requests for explanations.

As was previously explained, part 1 of Plaintiff's request asked for "[i]nformation about the models and data used to estimate battery costs for electrified vehicles." Ex. A, ECF No. 1, 2. Subpart A explained that the proposal and Preliminary Regulatory Impact Analysis ("PRIA") did "not state which version of the BatPaC NHTSA and U.S. EPA used to estimate battery costs." *Id.* at 2-3. Subpart B stated that "U.S. EPA and NHTSA should make available the information specifying the full battery sizes, in kilowatt-hours (kWh), battery pack configuration, and costs used for each vehicle iteration in the CAFE model." *Id.* at 3. Finally, subpart C stated that "[t]he proposal and PRIA provide conflicting information about which battery chemistries the agencies

considered." *Id.* Part 8 of Plaintiff's request asked for "the agencies detailed explanation and derivation of their point estimates for the increase in fatalities per hundred pounds of mass reduction over a constant footprint based on historical crash data." *Id.* at 5. Plaintiff explained that the details of such analysis had not been provided in a report. *Id.*

An agency must search for records responsive to a properly made FOIA request. However, "[t]o the extent that [a] plaintiff's FOIA requests [a]re questions or requests for explanations of policies or procedures, the[y] are not proper FOIA requests." *Jean-Pierre v. Fed. Bureau of Prisons*, 880 F. Supp. 2d 95, 103 (D.D.C. 2012) (internal quotation marks omitted). "FOIA neither requires an agency to answer questions disguised as a FOIA request or to create documents or opinions in response to an individual's request for information." *Hudgins v. Internal Revenue Service*, 620 F. Supp. 19, 21 (D.D.C. 1985) (internal citation omitted). Defendants contend that relevant portions of Plaintiff's letter, which was submitted as a comment through NHTSA's online docket for the proposed rule, were solicitations for specific pieces of information and explanations rather than requests for responsive documents.

As for part 1 of Plaintiff's FOIA request, Defendants argue that each subpart posed a specific question and asked for a discrete piece of information—subpart A asked for the BatPaC model used, subpart B asked for the battery size and configuration, and subpart C asked for the battery chemistries. Defendants argue that they went beyond their legal obligations by researching and drafting narrative responses to the specific issues identified by Plaintiff. However, Defendants contend that FOIA requirements do not apply to their searches or to their disclosures and withholdings.

The Court disagrees with Defendants' characterization of part 1 of Plaintiff's FOIA request. Defendants are correct that some portions of the request are in narrative form and

contain statements of perceived shortcomings in drafting the proposal and PRIA. However, agencies are obligated to construe FOIA requests liberally in favor of disclosure. *LeCedra v. Executive Office for U.S. Attorneys*, 17 F.3d 345, 348 (D.C. Cir. 2003). In part 1, Plaintiff requested "[i]nformation about the models and data used to estimate battery costs for electrified vehicles." Ex. A, ECF No. 1, 2. Plaintiff then went on to mention specific categories about which such information was requested. Construing part 1 liberally, Plaintiff was requesting records containing the information and data mentioned. *Mogenhan v. Dept' of Homeland Sec.*, Case No. 06-2045(EGS), 2007 WL 2007502, at *3 (D.D.C. 2007) (construing the plaintiff's questions about an investigative file as a request for the file itself).

Similarly, for part 8 of Plaintiff's request, Defendants contend that Plaintiff sought further agency explanation of a statistical analysis of vehicle fatalities performed as part of the rulemaking. Defendants argue that Plaintiff improperly sought an explanation rather than any particular record.

Again, the Court disagrees with Defendants' characterization of Plaintiff's part 8 request. In part 8, Plaintiff requested "the agencies detailed explanation and derivation of their point estimates for the increase in fatalities per hundred pounds of mass reduction over a constant footprint based on historical crash data." Ex. A, ECF No. 1, 4. Defendants are correct that part 8 went on to contain a narrative description of the alleged shortcomings of Defendants' statistical model. However, construing Plaintiff's request liberally, that narrative portion does not negate Plaintiff's initial request for data. And, the Court finds that such a request for data reasonably included documents containing such data.

In deciding that parts 1 and 8 of Plaintiff's letter constitute proper FOIA requests, the Court is also guided by Defendants' own actions. Plaintiff submitted its request on September

11, 2018. Defendants waited approximately one year to raise the issue of whether or not portions of Plaintiff's letter constituted a request for documents. *See* Aug. 15, 2019 email, ECF No. 18-9. If Defendants had such concerns, they could have and should have raised them earlier. *See Hall & Associates v. EPA*, 83 F. Supp. 3d 92, 102 (D.D.C. 2015) (faulting EPA for failing to comply with its regulations to engage in a collaborative process to implement the plaintiff's FOIA request). Additionally, while Defendants may not have been required to raise this issue in their Answer, the Court notes Defendants' failure to do so.

In sum, the Court concludes that parts 1 and 8 of Plaintiff's letter constituted proper FOIA requests. Defendants were required to comply with FOIA procedures in responding to those requests.

## B. Bad Faith

As an additional preliminary issue, Plaintiff argues that the Court should discount Defendants' declarations because Defendants have operated in bad faith. Plaintiff argues that Defendants have acted in bad faith in two respects. First, Plaintiff contends that Defendants falsely represented their pre-litigation interpretation of Plaintiff's FOIA request and mischaracterized the language therein. Second, Plaintiff argues that a representation made in one of Defendant's declarations is contradicted by a prior representation made through its counsel. The Court finds that neither incident is sufficient to infer bad faith on the part of the agencies.

First, Plaintiff contends that Defendants acted in bad faith by arguing in their Motion that portions of Plaintiff's letter did not constitute proper FOIA requests. The Court has already rejected Defendants' argument that the relevant portions of Plaintiff's letter do not constitute proper FOIA requests. *See Supra* Sec. III.A. However, the failure of Defendants' argument does not create an inference of bad faith.

Plaintiff's letter contained narrative critiques of the agencies' proposed rulemaking. Both parts 1 and 8 of the request contained such narrative portions. These narrative portions were somewhat ambiguous as to whether they represented a non-FOIA request for information or a FOIA request for documents. There is evidence that Defendants highlighted these ambiguities before briefing began. *See* Aug. 15, 2019 email, ECF No. 18-9 ("the express language of CARB's underlying FOIA request, which reads more like a set of interrogatories or a comment to a rulemaking docket rather than a FOIA request for documents, posed questions seeking specific information pertaining to the Notice of Proposed Rulemaking for SAFE Vehicles Rule"). The Court has determined that a liberal reading of these requests shows that they were requests for documents under FOIA. However, Defendants' argument is not specious or indicative of bad faith.

As further evidence of bad faith, Plaintiff points to Defendants' initial search for records responsive to the narrative portions of the letter. Plaintiff argues that Defendants' search shows that Defendants always considered Plaintiff's request to fall under FOIA and argued the opposite in bad faith. However, Defendants' search does not necessarily indicate that Defendants considered these narrative portions to be requests for records under FOIA. Instead, Defendants' actions can be read to represent an attempt to provide Plaintiff with the requested information, even if such requests were not made pursuant to FOIA. *See Landmark Legal Found. v. EPA*, 272 F. Supp. 2d 59, 64 (D.D.C. 2003) (explaining that defendants search in response to a question was "a testament to its good faith, rather than evidence that it conducted an improperly narrow search in bad faith"). As such, Defendants' search does not indicate bad faith.

Second, Plaintiff contends that Defendant NHTSA acted in bad faith due to inconsistent statements. In its declaration, NHTSA stated that "ANL performed the BatPaC modeling for the

NPRM" with NHTSA engineers assisting. Dec. of Rebecca Schade, ECF No. 18-7, ¶ 30. However, Plaintiff claims that NHTSA counsel previously represented by email on July 15, 2019 that "NHTSA conducted the specific battery cost analyses that CARB's FOIA is seeking information about." Dec. of Elaine Meckenstock, ECF No. 10-1, Ex. 5, at 1. The Court finds this alleged inconsistency can be explained without inferring bad faith.

The email statement that NHTSA conducted the battery cost analyses was not made by NHTSA counsel. Instead, the comment was made by EPA counsel. "The statement was meant to convey EPA's view that, of the two agencies to which Plaintiff's FOIA Request was addressed, NHTSA was more likely to have responsive records than EPA on this subject matter, if such records existed." Sec. Dec. of William Charmley, ECF No. 22-2. ¶ 14. In making the statement, EPA was not addressing whether or not NHTSA had worked with another agency to perform the analyses. While EPA's statement was imprecise, it does not indicate that NHTSA contradicted itself as to who was responsible for the BatPaC modeling. As such, the Court does not find grounds to infer bad faith.

## C. Defendant NHTSA's Search in Response to Part 1 of Plaintiff's Request

Having addressed the preliminary issues, the Court now moves to the substance of the parties' dispute. Plaintiff does not contest the adequacy of Defendant EPA's search. However, Plaintiff does dispute the adequacy of Defendant NHTSA's search in response to part 1 of Plaintiff's FOIA request. Specifically, Plaintiff argues that Defendant NHTSA does not appear to have conducted an adequate search for records responsive to subparts A and C of part 1 of the request.

Before analyzing the adequacy of Defendant NHTSA's search in response to part 1 of Plaintiff's request, the Court will explain the steps taken in conducting the search. Again, part 1

of Plaintiff's request sought "information about the models and data used to estimate battery costs for electrified vehicles." Ex. A, ECF No. 1, 2. Part 1 was divided into three subparts each requesting specific aspects of the data—the version of the BatPaC model, the battery configurations, and the battery chemistries.

The BatPaC is a model which was developed by the United States Department of Energy's ANL. Dec. of Rebecca Schade, ECF No. 18-7, ¶ 31. This model was not specifically developed for the SAFE Vehicles rule and is used by ANL and other agencies for unrelated purposes. The BatPaC model was used for the Safe Vehicles rulemaking as follows:

> ANL utilized the BatPaC model to generate lookup tables to identify potential costs associated with various battery configurations. In turn, costs from these lookup tables were subsequently incorporated into a separate model developed by ANL ("the Autonomie model"). The Autonomie model then generated outputs relating to the simulation of the design of motor vehicles. These values were incorporated, in turn, into the CAFE model. The CAFE model was developed by the Volpe Center and was used to perform the analysis that helped to inform the Agencies regarding potential effects of different specific fuel economy standards.

*Id.*

In responding to part 1 of Plaintiff's request, NHTSA's FOIA office contacted Jim Tamm, the Chief of NHTSA's Fuel Economy Division which was responsible for NHTSA's analysis and formulation of the SAFE Vehicles Rule. *Id.* at ¶ 32. The office also contacted Kevin Green, the Chief of the Corporate Average Fuel Economy ("CAFE") Program Office at the Volpe Center. *Id.* at ¶ 33. Based on the recommendations of Mr. Tamm and Mr. Green, the office contacted members of the NHTSA Fuel Economy Division and the Volpe Center to determine which staff would be most likely to have information or materials responsive to part 1 of Plaintiff's request. Through this process, the office identified two engineers in NHTSA's Fuel Economy Division, Vinay Nagabhushana and Seiar Zia, who worked especially closely with the ANL on the modeling process. *Id.* at ¶ 34. Mr. Nagabhushana and Mr. Zia were provided copies

of Plaintiff's part 1 request and were asked to identify responsive materials for all three subparts. *Id.*

Mr. Nagabhushana and Mr. Zia identified two locations which could contain potentially responsive documents. First, they searched subfolders stored on a shared drive for NHTSA's Fuel Economy Group. Sec. Dec. of Rebecca Schade, ECF No. 22-1, ¶ 8. One specific subfolder was used to save materials involving the electrification analysis, which included ANL's BatPaC modeling. *Id.* Second, they searched folders stored on the engineers' local computer drives and personal folders. These folders also specified a location where materials related to the electrification analysis, including emails from ANL, would be saved. *Id.* In searching these folders, the engineers manually reviewed the contents of the folders to find any records that were potentially responsive. In searching, they focused, in part, on any documents mentioning "ANL" because ANL performed the BatPaC modeling. *Id.* at ¶ 9. "The materials identified through these searches matched the engineers' expectations regarding the universe of material that existed with the agency on the topic, as the engineers were personally familiar with the subject matter through their ordinary work responsibilities at NHTSA." *Id.* at ¶ 10. They did not search other locations as "it was not consistent with the engineers' work processes to store such materials outside of the searched locations and the searched locations did not appear to be missing any documents." *Id.*

Specifically, in subpart A, Plaintiff requested information on "which version of the BatPaC NHTSA and U.S. EPA used to estimate battery costs." Ex. A, ECF No. 1, 2. As was previously explained, NHTSA "relied on ANL's battery experts to provide the cost and battery size data generated by the BatPaC model." Dec. of Rebecca Schade, ECF No. 18-7, ¶ 36. "[W]hile NHTSA engineers participated in the process and provided input on the Autonomie modeling, ANL conducted the actual BatPaC modeling for the proposed rule." *Id.* NHTSA

searched for material relating to subpart A, but NHTSA concluded that the Department of Energy's ANL "was the appropriate point of contact for records reflecting some of the requested BatPaC material." *Id.*

In conducting their search for records responsive to subpart A, the custodians who worked most closely with ANL on the BatPaC modeling identified material describing the process and some of the values associated with the model. *Id.* at ¶ 37. However, the records did not list the actual number designator identifying the version of the BatPaC model used. *Id.* Through talks with ANL, the custodians understood that version 3.0 of the BatPaC model was used in the analysis. As such, NHTSA provided Plaintiff with this piece of information in narrative form. *Id.* Additionally, as BatPaC is a publicly available model, NHTSA also provided Plaintiff with information to contact ANL to receive the model. *Id.* at ¶ 38.

In subpart B, Plaintiff sought information related to "full battery sizes, in kilowatt-hours (kW), battery pack configuration, and costs used for each vehicle iteration in the CAFE model." Ex. A, ECF No. 1, 3. In responding, NHTSA directed Plaintiff to excel files which are available on NHTSA's rulemaking docket or website. These files contain excessive numbers of pages, so NHTSA directed Plaintiff to the specific columns containing relevant information such as peak battery power, battery total energy in kWh, and battery pack direct manufacturing costs. Dec. of Rebecca Schade, ECF No. 18-7, ¶ 40. Additionally, NHTSA directed Plaintiff to reports posted to the online rulemaking docket which contain analysis and context relating to ANL's role in battery modeling. *Id.* at ¶ 41.

While these records contained information responsive to much of Plaintiff's subpart B request, the records did not contain information on the battery pack configurations for the BatPaC modeling. *Id.* at ¶ 42. The NHTSA engineers who worked most closely with ANL on the

modeling indicated that they located no records on the specific battery pack configurations used for the modeling. *Id.*

Finally, in subpart C, Plaintiff sought information about the battery chemistries used in the BatPaC modeling. Ex. A, ECF No. 1, 3. The engineers who worked most closely with ANL on the BatPaC modeling indicated that the analysis did not modify the default battery chemistries for BatPaC version 3.0, which are available in the rulemaking docket and on NHTSA's website. Dec. of Rebecca Schade, ECF No. 18-7, ¶ 45. In addition to referring Plaintiff to the public documents, NHTSA provided a narrative answer confirming the chemistries. *Id.* at ¶ 46.

Based on Defendant NHTSA's declaration, the Court finds that the search conducted in response to part 1 of Plaintiff's request was sufficient. "The Court applies a 'reasonableness' test to determine the 'adequacy' of search methodology ... consistent with the congressional intent tilting in favor of disclosure." *Campbell v. U.S. Dep't of Justice*, 164 F.3d 20, 27 (D.C. Cir. 1998) (internal citation omitted). An agency "fulfills its obligations under [the] FOIA if it can demonstrate beyond material doubt that its search was reasonably calculated to uncover all relevant documents." *Ancient Coin Collectors Guild v. U.S. Dep't of State*, 641 F.3d 504, 514 (D.C. Cir. 2011) (internal quotation marks omitted). The agency may submit affidavits or declarations to explain the method and scope of its search and such affidavits or declarations are "accorded a presumption of good faith, which cannot be rebutted by purely speculative claims about the existence and discoverability of other documents." *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (internal quotation marks omitted). However, if the record "leaves substantial doubt as to the sufficiency of the search, summary judgment for the agency is not proper." *Truitt v. Dep't of State*, 897 F.2d 540, 542 (D.C. Cir. 1990).

As was previously explained, in its declarations, Defendant NHTSA stated that it provided Plaintiff's request to the two engineers who worked most closely with ANL in conducting the BatPaC modeling. Those engineers manually searched the locations most likely to contain any responsive documents to all subparts of Plaintiff's part 1 request. The materials which were identified as potentially responsive to Plaintiff's request matched the engineers' expectations, and they explained that no other locations were likely to contain missing documents.

Plaintiff has three argument as to why the Court should find Defendant NHTSA's search inadequate. The Court is persuaded by none of the arguments.

First, Plaintiff argues that the Court should not rely on Defendant NHTSA's declaration explaining its search due to the Defendants' bad faith. The Court has already addressed this argument and found no evidence of bad faith. *See Supra* Sec. III.B. As such, NHTSA's declaration will be accorded the usual presumption of good faith. *SafeCard Servs.*, 926 F.2d at 1200 (explaining that agency declarations are accorded a presumption of good faith).

Second, Plaintiff argues that Defendant NHTSA's first declaration did not address subparts A or C. According to Plaintiff, "[i]n stark contrast to her clear statements regarding a 'search' for records responsive to part 1(b), Schade says that potential custodians 'identified' or were 'requested to identify' records responsive to parts 1(a) and 1(c), not that they were asked to search or did search." Pl.'s Reply, ECF No. 20, 14. However, any inconsistencies in Defendant NHSTA's use of language was clarified in Defendant NHTSA's second declaration. In the second declaration, Defendant NHTSA explains that "the same two engineers were the relevant agency custodians for all three subparts of Part 1." Sec. Dec. of Rebecca Schade, ECF No. 22-1, ¶ 7. These agency custodians then conducted the above-described "search to locate records

responsive to any subsection of Part 1 of CARBS's letter." *Id.* at ¶ 8. Accordingly, Defendant NHTSA has provided uncontroverted evidence that it conducted a search for records responsive to all three subparts of part 1 of Plaintiff's request.

Finally, Plaintiff argues that Defendant NHTSA's search was inadequate because it failed to discover a sufficient number of responsive records. According to Plaintiff, "NHTSA would have this Court believe, among other things, that no documentation of modeling specifications was ever created by NHTSA or shared with NHTSA by ANL, that the NHTSA engineers working closely with ANL never exchanged an email or specifications documents indicating what version of the model ANL was using or that the default battery chemistries were being used, and that the NHTSA engineers who 'understood' this information never emailed it to anyone or otherwise wrote it down." Pl.'s Reply, ECF No. 20, 15.

Plaintiff's base speculation that other documents must exist is not sufficient to show that Defendant NHTSA's search was inadequate. "[T]he issue to be resolved is not whether there might exist any other documents possibly responsive to the request, but rather whether the search for those documents was adequate." *Weisberg v. U.S. Dep't of Justice*, 745 F.2d 1467, 1485 (D.C. Cir. 1984). Here, Defendant NHTSA's declarant indicates "'which files were searched,' by whom those files were searched, and ... a 'systematic approach to document location.'" *Toensing v. U.S. Dep't of Justice*, 890 F. Supp. 2d 121, 142 (D.D.C.2012) (quoting *Weisberg v. U.S. Dep't of Justice*, 627 F.2d 365, 371 (D.C. Cir. 1980)). The agency custodians indicated that no other locations were reasonably likely to contain responsive records. And, as was previously explained, Defendant NHTSA's declaration is given a presumption of good faith. *SafeCard Servs.*, 926 F.2d at 1200. Additionally, Defendant NHTSA provided a reasonable explanation as to why more documents were not located—ANL, not NHTSA, conducted the BatPaC modeling.

Here, Plaintiff's "purely speculative claims about the existence and discoverability of other documents" is insufficient to show the inadequacy of the search. *Id.* (internal quotation marks omitted).

For the reasons given, the Court concludes that Defendant NHTSA's search in response to part 1 of Plaintiff's request was reasonably calculated to uncover all responsive documents.

**D.  Defendants' Withholdings under FOIA Exemption 5**

In addition to disputing the adequacy of Defendant NHTSA's search, Plaintiff also disputes certain withholdings by both Defendants. First, Plaintiff argues that Defendant EPA wrongfully withheld under FOIA Exemption 5's deliberative process privilege portions of two email threads responsive to part 1 of Plaintiff's request. Second, Plaintiff challenges Defendant NHTSA's withholding, also pursuant to FOIA Exemption 5's deliberative process privilege, of two draft reports responsive to part 8 of Plaintiff's request.

FOIA Exemption 5 protects "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). Over the years, it has been construed as protecting "those documents, and only those documents, normally privileged in the civil discovery context." *Nat'l Labor Relations Bd. v. Sears, Roebuck & Co.*, 421 U.S. 132, 149 (1975). It provides protection to "materials which would be protected under the attorney-client privilege, the attorney work-product privilege, or the executive 'deliberative process' privilege." *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 862 (D.C. Cir. 1980) (internal citations omitted). In this case, Defendants rely on only one recognized privilege—the deliberative process privilege.

Under the federal common law, the proponent bears the burden of demonstrating the applicability of any asserted privilege. *In re Subpoena Duces Tecum Issued to Commodity*

18

*Futures Trading Comm'n WD Energy Servs., Inc*., 439 F.3d 740, 750 (D.C. Cir. 2006). To meet

that burden, the proponent must establish the claimed privilege with "reasonable certainty." *Fed.*

*Trade Comm'n v. TRW, Inc*., 628 F.2d 207, 213 (D.C. Cir. 1980). Specifically, the proponent

must adduce competent evidence in support of "each of the essential elements necessary to

sustain a claim of privilege." *Alexander v. Fed. Bureau of Investigation*, 192 F.R.D. 42, 45

(D.D.C. 2000). The proponent "must offer more than just conclusory statements, generalized

assertions, and unsworn averments of its counsel." *In re Application of Veiga*, 746 F. Supp. 2d

27, 34 (D.D.C. 2010). Where the proponent fails to adduce sufficient facts to permit the district

court to conclude with reasonable certainty that the privilege applies, its burden has not been

met. *TRW*, 628 F.2d at 213.

The deliberative process privilege protects not only communications that are deliberative

in nature, but all communications which, if revealed, would expose to public view the

deliberative process of an agency. *Russell v. Dep't of the Air Force*, 682 F.2d 1045, 1048 (D.C.

Cir. 1982). This privilege is intended to protect the decision-making "'processes of the executive

branch in order to safeguard the quality and integrity of governmental decisions.'" *A. Michael's*

*Piano, Inc. v. FTC*, 18 F.3d 138, 147 (2d Cir. 1994) (quoting *Hopkins v. Dep't of House & Urban*

*Dev*., 929 F.2d 81, 84 (2d Cir. 1991)). Discussions among agency personnel about the relative

merits of various positions which may be adopted are just as a much a part of the deliberative

process as the actual recommendations and advice which are agreed upon. *See Mead Data*

*Central, Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 257 (D.C. Cir. 1977). Congress created

this exception in the FOIA because it believed that forcing agencies to "operate in a fishbowl"

would undermine the quality of administrative decision-making by preventing the full and frank

exchange of ideas on legal and policy matters. *Id.* at 256 (citing to S. Rep. No. 813, 89th Cong.,

1st Sess. 9, and H.R. Rep. No. 1497, 89th Cong., 2d Sess. 10 (1966)). Consistent with congressional intent on the subject, this Circuit has construed Exemption 5 "as narrowly as consistent with efficient Government operation." *Wolfe v. Dep't of Health & Human Servs.*, 839 F.2d 768, 773 (D.C. Cir. 1988) (en banc) (citing *Mead Data*, 566 F.2d at 256).

For the deliberative process privilege to apply under Exemption 5, this Court must determine the material to be both pre-decisional and deliberative. *Id.* at 774. "A document is pre-decisional if it was 'prepared in order to assist an agency decision maker in arriving at his decision,' rather than to support a decision already made." *Petroleum Info. Corp. v. Dep't of the Interior*, 976 F.2d 1429, 1434 (D.C. Cir. 1992) (quoting *Renegotiation Bd. v. Grumman Aircraft Eng'g Corp.*, 421 U.S. 168, 184 (1975)). At its most basic, the courts have held that a document is deliberative in nature if "it reflects the give-and-take of the consultative process." *Coastal States*, 617 F.2d at 866. Because Exemption 5's goal is to "prevent injury to the quality of agency decisions," the deliberative process privilege can apply only to deliberative processes the results of which are or will be agency policy. *See Petroleum Info. Corp.*, 976 F.2d at 1434. Documents containing advisory opinions and recommendations, or reflecting deliberations comprising the process by which government policy is formulated are protected. *Mead Data*, 566 F.2d at 256. Exemption 5 protection does not extend to documents that do not "discuss the wisdom or merits of a particular agency policy, or recommend new agency policy." *Coastal States*, 617 F.2d at 869.

### 1.  Defendant EPA's Redactions

The Court begins by examining Defendant EPA's redactions, pursuant to FOIA Exemption 5's deliberative process privilege, to two email threads. The first email thread is dated July 30, 2018. The email is from William Charmley, the Director for the Assessment and

Standards Division of the EPA, to six EPA employees. Dec. of William Charmley, ECF No. 18-8, ¶ 13. The subject line states "Fwd: Responses to 12866 Comments." *Id.* The email was drafted as part of the EPA's work with NHTSA in relation to the NPRM for the SAFE Vehicles Rule, issued August 24, 2018. The email thread concerns Mr. Charmley's reactions to comments made by another federal agency during an inter-agency review process. *Id.* at ¶ 14. The second email thread is dated August 9, 2018. The email is from Mike Safoutin, an EPA employee, to Shabbir Ahmed, a Department of Energy employee at ANL. *Id.* at ¶ 17. The subject line reads "Status of BatPaC." *Id.* The email was drafted as part of communications between the staff of EPA and ANL regarding the BatPaC model and the ways that the model could be used for the SAFE Vehicles Rule. *Id.* at ¶ 19.

The Court finds that the information in these two email threads was rightfully withheld for two independent reasons. First, the withheld information is not responsive to Plaintiff's FOIA request. In its Reply, Plaintiff states that "[t]o be responsive to part 1, the emails must contain the BatPaC version, battery pack configuration, or battery chemistries actually used in the modeling relied on in the NPRM." Pl.'s Reply, ECF No. 20, 21. In so explaining, Plaintiff has defined the intended scope of its request. Defendant EPA has filed a declaration explaining that neither email thread "contains the BatPaC version, battery configuration, or battery chemistries actually used in the modeling relied on in the NPRM." Sec. Dec. of William Charmley, ECF No. 22-2, ¶ 8. Defendant EPA explains that the first email thread reflects Mr. Charmley's thoughts about comments from another agency shared during an interagency review process for the SAFE Vehicles Rule. *Id.* at ¶ 9. The email was initially flagged as responsive because it generally discusses the battery analysis; however, the email does not contain the three specific pieces of information requested. *Id.* at ¶ 10. The second email discusses a modeling approach for the

BatPaC model used in preliminary analyses for the SAFE Vehicles Rule. *Id.* at ¶ 11. The email was initially flagged as responsive because it generally discusses the BatPaC model; however, the email does not contain the three specific pieces of information requested. *Id.* Because Plaintiff has precisely defined the scope of its request, and because the withheld portions of the email threads to not contain the requested information, the information is rightfully withheld as not responsive. *See Kenney v. U.S. Dep't of Justice*, 603 F. Supp. 2d 184, 189 (D.D.C. 2009) ("Plaintiff cannot allege that the agency failed to produce responsive records, when the records he now identifies fall outside the scope of his appropriately narrowed request."); see *also Williams v. Ashcroft*, 30 Fed. Appx. 5, 6 (D.C. Cir. 2002) (explaining that agencies are not required to produce records outside the scope of the FOIA request).

Second, even if the redacted information was responsive, the Court finds that the information was rightly withheld as predecisional and deliberative. The first email thread was predecisional because it was drafted to further EPA's work with NHTSA to develop the NPRM for the SAFE Vehicles Rule. The email was sent on July 30, 2018, and the Notice was not issued until August 24, 2018. Dec. of William Charmley, ECF No. 18-8, ¶ 14. The email does not contain any final decision on the Notice or on the Rule. *Id.* The email is also deliberative. The email reflects Mr. Charley's "opinions, analysis, and discussion" relating to his understanding of comments made by another agency during the process of developing the Notice. *Id.* at ¶ 15. "The email does not contain any factual information that would be reasonably segregable from the deliberative content." *Id.* at ¶ 16. No further segregation of information from the withheld material "could be done without disclosing information that FOIA protects from disclosure." *Id.* at ¶ 20; *Johnson v. Office for U.S. Attorneys*, 310 F.3d 771, 776-77 (D.C. Cir. 2002) (finding

combination of *Vaughn* index and agency declaration sufficient to fulfill agency's obligation on segregability).

The second email was also predecisional because it relates to the analysis that ANL was conducting as part of the SAFE Vehicles rulemaking process. The NPRM was not issued until approximately two weeks after the email was sent, and the final rule was not issued until much later. Dec. of William Charmley, ECF No. 18-8, ¶ 18. The email does not reflect a final decision on the proposed Rule or Notice. *Id.* Additionally, the email was deliberative as it reflects "a back-and-forth discussion between the staff members of two agencies regarding the details of a particular modeling approach for the BatPaC model, including the ways that model may be used in the context of the SAFE Vehicles Rule." *Id.* at ¶ 19. The email contains opinions about the modeling approach and its application to the rulemaking process. *Id.* "There is no factual information that is segregable from the withheld portion of the email," and no further segregation could be accomplishing without releasing information protected by FOIA. *Id.* at ¶ 19-20; *Johnson*, 310 F.3d at 776-77.

Withholding the redacted information furthers the purposes of the deliberative process privilege. Because the redacted material in both emails is predecisional and deliberative, its disclosure would expose EPA's decision-making process, "including exposing the agency's preliminary deliberations, thoughts, and analyses." Dec. of William Charmley, ECF No. 18-8, ¶ 16. Release of the redacted information could cause confusion because it reflects initial opinions, rather than the agency's final decision on the SAFE Vehicles Rule. *Id.*

Finally, the Court addresses the fact that on March 30, 2020, EPA and NHTSA signed the final version of the SAFE Vehicles Rule. Pl.'s Notice, ECF No. 25, 1. Plaintiff contends that, because the final rule has now been issued, the redacted emails are no longer predecisional and

there would be no harm from releasing the withheld information. The Court disagrees. The issuance of the final rule has no effect on the emails' predecisional status. *Jordan v. Dep't of Justice*, 591 F.2d 753, 774 (D.C. Cir. 1978) (a predecisional document must be "[a]ntecedent to the adoption of an agency policy"). "[T]he case law is clear that, even after a final decision has been made, a pre-decisional inter- or intra-agency memorandum that is part of the deliberative process does not lose the protection of Exemption 5 unless it has been expressly incorporated into the final decision." *Jowett v. Dep't of Navy*, 729 F. Supp. 871, 875 (D.D.C. 1989). And, the withheld information was not incorporated into the NPRM or final Rule. Dec. of William Charmley, ECF No. 18-8, ¶ 14-16. Moreover, the issuance of the final rule does not obviate the harm from disclosure. Disclosure would still risk confusion as to the Rule because the emails reflect EPA staff's initial opinions, not the final agency decision. *Coastal States Gas Corp.*, 617 F.2d at 866 (stating that the deliberative process privilege ensures "against confusing the issues and misleading the public by dissemination of documents suggesting reasons and rationales for a course of action which were not in fact the ultimate reasons for the agency's action").[3]

### 2. Defendant NHTSA's Withholding

The Court next considers Defendant NHTSA's withholding under FOIA Exemption 5's deliberative process privilege of two responsive documents. In part 8 of its request, Plaintiff sought "the agencies detailed explanation and derivation of their point estimates for the increase

---

[3] The Court finds that in camera review of the two redacted emails is not necessary because Defendant EPA has provided sufficient evidence through its declarations that the redacted material is protected from disclosure by FOIA Exemption 5. An in camera inspection is unnecessary when, as here, "a district court finds that a ... agency's affidavits sufficiently describe the documents and set forth proper reasons for invoking an exemption[.]" *Juarez v. Dep't of Justice*, 518 F.3d 54, 60 (D.C. Cir. 2008). Plaintiff has provided no factual basis for questioning the agency's declarations, which are otherwise accorded "a presumption of good faith[.]" *Long v. U.S. Dep't of Justice*, 450 F. Supp. 2d 42, 54 (D.D.C. 2006) (internal citation and quotation marks omitted).

in fatalities per hundred pounds of mass reduction over a constant footprint based on historical crash data." Ex. A, ECF No. 1, 5. In response to this request, Defendant NHTSA withheld two documents pursuant to the deliberative process privilege. Plaintiff contends that the documents were wrongfully withheld. The Court disagrees.

Both withheld documents are draft reports by Sean Puckett, a mathematical statistician in NHTSA's Office of Regulatory Analysis and Evaluation. Dec. of Rebecca Schade, ECF No. 18-7, ¶ 60. The first draft report is a "technical summary of the logistic regression analysis and its results in the near future." Dec. of Andrew DiMarisco, ECF No. 18-6, ¶ 51. The second draft report is a "report similar to the 2016 Puckett and Kindelberger report that will describe the methodological process by which the results were derived." *Id.* Both reports "remain in draft format and have not progressed through the NHTSA process to reach final form." Dec. of Rebecca Schade, ECF No. 18-7, ¶ 60. The draft reports have not been reviewed by the agency's decisionmakers nor have they been accepted by the agency. *Id.*

First, the Court finds that both draft reports are predecisional. Neither document has been finalized by Mr. Puckett and both documents remain in draft format. Additionally, neither document been published in any way. Dec. of Andrew DiMarisco, ECF No. 18-6, ¶ 54. The reports have not been endorsed by NHTSA and do not represent the final decision of the agency or the agency's decisionmakers. Dec. of Rebecca Schade, ECF No. 18-7, ¶ 60. As such, copies of the draft reports exist "in pre-decisional forms that [do] not reflect the final views of the Agency or even their authors." *Id.* at ¶ 61. Additionally, these draft reports were part of an ongoing evaluation of the underlying data which would contribute to both the NPRM and the final Rule itself. Sec. Dec. of Rebecca Schade, ECF No. 22-1, ¶ 17. The Court notes that the publication of the final Rule does not affect the draft reports' predecisional nature as there has been no decision

by NHTSA to endorse or publish the draft reports and the final rule contains its own analysis of overlapping data. Dec. of Rebecca Schade, ECF No. 18-7, ¶ 64; Defs.' Res., ECF No. 28, 8-9.

Second, the Court finds that both draft reports are deliberative. They reflect the author's preliminary impressions of the statistical methodologies used to compare crash fatalities with motor vehicle weight. Sec. Dec. of Rebecca Schade, ECF No. 22-1, ¶ 15. The draft reports represent an ongoing effort to describe the statistical methodologies used to compare crash fatality rates and an effort to continue evaluation of the underlying data and methodologies. *Id.* at ¶ 16; *See Coastal States Gas Corp.*, 617 F.2d 854, 866 (D.C. Cir. 1980) (explain that "draft documents" are usually deliberative).

Moreover, release of these deliberative documents would result in harm for the agency. As the draft reports are not finalized, their disclosure would result in confusion as to which documents represent NHTSA's final decisions and which documents are merely preliminary opinions. Dec. of Rebecca Schade, ECF No. 18-7, ¶ 63. Disclosure would also risk chilling the work product of NHTSA staff due to fear that early drafts of their reports could be released to the public. *Id.* This risk is heightened where the draft reports are attributable to a single author who has not had "the opportunity to finish editing his own language and soliciting internal review, input, and approval." *Id.; National Security Archive v. CIA*, 752 F.3d 460, 463 (D.C. Cir. 2014) ("the writer needs to know at the time of writing that the privilege will apply and that the draft will remain confidential, in order for the writer to feel free to provide candid analysis").

The Court also considers that, while the draft reports are not subject to disclosure, "NHTSA personnel contacted about this Item also identified a separate record that described the analysis and contained the underlying data on which the analysis was based." Dec. of Rebecca Schade, ECF No. 18-7, ¶ 64. Such information has been provided to Plaintiff. *Id*. While the draft

reports also concern the underlying data, the draft reports are not themselves the analysis which was endorsed by NHTSA. Sec. Dec. of Rebecca Schade, ECF No. 22-1, ¶ 16; *see Common Cause v. IRS*, 646 F.2d 656, 660 (D.C. Cir. 1981) (explaining that "allusion in a post-decisional document to subject matter discussed in some pre-decisional, intra-agency memoranda is not the express adoption or incorporation by reference which . . . would remove the protection of Exemption 5").

Finally, the Court finds that no non-exempt information could be segregated and released from the two draft reports. NHTSA's declarant stated that "NHTSA has released all reasonably segregable, non-exempt information to CARB in response to the FOIA request." Dec. of Andrew DiMarisco, ECF No. 18-6, ¶ 57. *Johnson*, 310 F.3d at 776-77 (finding combination of *Vaughn* index and agency declaration sufficient to fulfill agency's obligation on segregability).[4]

## IV.    CONCLUSION

For the reasons provided above, the Court GRANTS Defendants' Motion for Summary Judgment and DENIES Plaintiff's Motion for Summary Judgment.

The Court finds that Defendant NHTSA conducted an adequate search in response to part 1 of Plaintiff's request. The Court further finds that Defendant EPA's redactions on two email threads and Defendant NHTSA's withholding of two draft reports are protected by FOIA

---

[4] The Court finds that in camera review of the two draft reports is not necessary because Defendant NHTSA has provided sufficient evidence through its declarations that the redacted material is protected from disclosure by FOIA Exemption 5. An in camera inspection is unnecessary when, as here, "a district court finds that a … agency's affidavits sufficiently describe the documents and set forth proper reasons for invoking an exemption [.]" Juarez v. Dep't of Justice, 518 F.3d 54, 60 (D.C. Cir. 2008). Plaintiff has provided no factual basis for questioning the agency's declarations, which are otherwise accorded "a presumption of good faith[.]" Long v. U.S. Dep't of Justice, 450 F. Supp. 2d 42, 54 (D.D.C. 2006) (internal citation and quotation marks omitted).

Exemption 5's deliberative process privilege. A separate Order accompanies this Memorandum

Opinion.


                                                                           /s/

**COLLEEN KOLLAR-KOTELLY**
United States District Judge